IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| | * | 4:09-cr-00004 |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| CHANDRA MOHAN RAO MANDALAPU, | * | ORDER |
| VISWA MOHAN MANDALAPU, and | * | |
| VISION SYSTEMS GROUPS, INC., | * | |
| | * | |
| Defendants. | * | |
| | * | |

Before the Court are two Motions filed by the above captioned Defendants (individually

"Defendant" or collectively "Defendants"). The first is a Motion to Dismiss and Strike Portions

of the Second Superseding Indictment, filed on September 21, 2009. Clerk's No. 81. The

second is a Motion to Suppress, filed on October 16, 2009.[1] Clerk's No. 87. Defendants filed an

accompanying overlength brief in support of the Motion to Suppress on October 19, 2009.

Clerk's No. 90. The Government filed a Resistance to the Motion to Suppress on January 12,

2010. Clerk's No. 106. The Government filed a Resistance to the Motion to Dismiss on January

19, 2010. Clerk's No. 108. The Court held a hearing on the matters on January 20, 2010.

Clerk's No. 110. Defendants filed a Reply to the Resistance to the Motion to Suppress on

January 25, 2010. Clerk's No. 114. Defendants also filed a document entitled "Defendants'

Supplemental Statement in Support of Motion to Suppress" on January 27, 2010. Clerk's No.

115. The matters are fully submitted.

---

[1] Defendants' Motion to Dismiss incorporated, by reference, aspects of their prior
Motions to Dismiss (Clerk's Nos. 19, 42), as well as the responses and subsequent replies to
those Motions (Clerk's Nos. 22, 24, 50, 54).

## I.   FACTUAL AND PROCEDURAL HISTORY

According to the Government, Defendant Vision Systems is a New Jersey based information technology consulting firm that conspired to fraudulently obtain immigration documents in order to facilitate the entry of alien workers, who would otherwise not be entitled to enter or remain in the United States.  *See generally* Clerk's No. 59.  The Government also asserts that Defendant Viswa Mandalapu, the president of Vision Systems, and Defendant Chandra Mandalapu, an officer in the corporation, participated in this conspiracy through various overt acts.  *Id.*

Much of the evidence against Defendants stems from a multi-year investigation by Special Agent Gustavo Ponce ("Agent Ponce") of the Department of Homeland Security, Bureau of Immigration and Customs Enforcement ("ICE").  Tr. at 113.  During the course of his investigation, on February 11, 2009, Agent Ponce led an approximately twenty member team in searching the New Jersey office of Defendant Vision Systems, pursuant to a search warrant ("Warrant").  *Id.* at 110-11, 114.  The Warrant authorized the Government to search for and seize evidence of immigration fraud, money laundering, mail fraud, and wire fraud.  Hr'g Ex. 2.  During the execution of the search, Agent Ponce and his team seized the majority of the company's paper records, primarily immigration, financial and personnel records, and made digital copies of nearly, if not all, of the company's computer hard drives.  Tr. at 111, 119, 121.

Based at least in part upon this evidence, on August 27, 2009, a grand jury returned a second superceding indictment ("Indictment") against Defendants, charging them with committing seventeen crimes.  Clerk's No. 59.  The Indictment also provided a notice of forfeiture.  *Id.*  More specifically, Count One generally alleges that Defendants conspired to

fraudulently obtain immigration documents, namely H1-B visas and/or alien registration receipt cards, i.e., "green cards," by making materially false statements to the Government, in violation of 18 U.S.C. § 371.  Counts Two through Nine generally allege that Defendants committed mail fraud related to this scheme by mailing, via FedEx, documents to the Iowa Department of Workforce Development that contained material misstatements, in violation of 18 U.S.C. § 1341. Counts Ten through Twelve further allege Defendants committed mail fraud, in violation of 18 U.S.C. § 1341, by making similar misrepresentations to the United States Citizenship and Immigration Services ("USCIS").  Counts Thirteen through Seventeen generally allege that Defendants Viswa Mandalapu and/or Chandra Mandalapu made false statements to the Government related to the aforementioned scheme, in violation of either 18 U.S.C. § 1001 or § 1546.  Finally, Count Eighteen contains a Notice of Forfeiture, pursuant to 18 U.S.C. § 981 and 28 U.S.C. § 2461.

Defendants now contest nearly every Count contained in the Indictment and challenge the validity of the Warrant, as well as the manner in which Agent Ponce executed it, in their two Motions.  Defendants request that the Court dismiss the mail fraud charges contained in Counts Two through Nine because the Government "has not charged a cognizable mail fraud theory." Defs.' Br. in Supp. of Mot. to Dismiss at 5-10.  Alternatively, Defendants argue that the Court should dismiss these Counts because they are "gilded," that is, they represent the Government's attempt to cure a defect in a previous indictment that runs afoul of the Speedy Trial Act.  *Id*. at 10-14.  Additionally, Defendants request that the Court dismiss the mail fraud charges contained in Counts Ten through Twelve because they fail to allege proper venue and fail to allege any wrongdoing.  *Id*. at 14-18.  Defendants also request that the Court dismiss the forfeiture allegation

in Count Eighteen because it is impermissibly vague and because it is predicated upon the fatally

flawed mail fraud Counts. *Id*. at 18-19. Moreover, Defendants request that the Court suppress

any evidence of the February 11, 2009 search because the Warrant is fatally overbroad and

insufficiently particular and because Agent Ponce exceeded the scope of the Warrant by failing to

comply with its nominal restrictions. *See* Defs.' Br. in Supp. of Mot. to Suppress. The

Government denies all of Defendants' assertions, arguing that the Indictment and search complied

with all governing laws.

## II.   LAW AND ANALYSIS

### A.   *Motion to Dismiss*

The sufficiency of an indictment is a matter of law to be determined by the Court. *United

States v. Hance*, 501 F.3d 900, 906 (8th Cir. 2007) (quoting *United States v. Dolan*, 120 F.3d 856,

864 (8th Cir. 1997)). Under Federal Rule of Criminal Procedure 7, an indictment must contain "a

plain, concise, and definite written statement of the essential facts constituting the offense

charged." In interpreting this provision, the Eighth Circuit has repeatedly held:

> An indictment is legally sufficient on its face if it contains all of the essential elements
> of the offense charged, fairly informs the defendant of the charges against which he
> must defend, and alleges sufficient information to allow a defendant to plead a
> conviction or acquittal as a bar to a subsequent prosecution.

*United States v. Carter*, 270 F.3d 731, 736 (8th Cir. 2001) (citing *United States v. Wessels*, 12

F.3d 746, 750 (8th Cir. 1993)). An indictment ordinarily need not contain every fact pertaining to

a charge so long as it states the essential elements of an offense in a manner that provides

adequate notice to a defendant. *Hance*, 501 F.3d at 906 ("Typically an indictment is not

sufficient only if an essential element of the offense is omitted from it.") (quoting *United States v.

Cuervo*, 354 F.3d 969, 985 (8th Cir. 2004)). If an indictment fails to state an offense or is

defective in some other fashion, a defendant may move to strike all or part of the indictment under Federal Rule of Criminal Procedure 12(b)(3)(B).

      1.     *Mail fraud as alleged in Counts Two through Nine.*

As both parties agreed in the hearing, the Government is pursuing the mail fraud charges contained in Counts Two through Nine on the theory that Defendants schemed to deprive United States workers out of two property rights, namely their right to notice provided for in the H1-B visa regulations and their rights in employment. Tr. at 10-11. Defendants challenge the validity of the Government's theory, asserting that the two enumerated rights are not property within the meaning of 18 U.S.C. § 1341.

Title 18 U.S.C. § 1341 provides in relevant part: "Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises [uses the mails in furtherance of the scheme] shall be fined [or] imprisoned . . . or both." To establish mail fraud under § 1341, the Government must prove that a defendant:

> (1) voluntarily and intentionally devised or participated in a scheme to obtain money or property by means of false representations or promises, (2) entered into the scheme with the intent to defraud, (3) knew it was reasonably foreseeable that the mails would be used, and (4) used the mails in furtherance of some essential step in the scheme.

*United States v. Kelly*, 152 F.3d 881, 887 (8th Cir. 1998) (citation omitted). Since *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court has generally held that this statute is "'limited in scope to the protection of property rights.'"[2] *Cleveland v. United States*, 531 U.S. 12,

---

[2] The one exception to this general rule stems from Congressional action to overturn the specific holding in *McNally*. After *McNally*, Congress enacted 18 U.S.C. § 1346 in order to expand the reach of the mail fraud statute to cases involving "the intangible right of honest services." *United States v. Cleveland*, 531 U.S. 12, 19-20 (2000). The Court need not, however,

18 (2000) (quoting *McNally*, 483 U.S. at 360).  These property rights may be both tangible and

intangible.  *Carpenter v. United States*, 484 U.S. 19, 25-26 (1987) (stating that "*McNally* did not

limit the scope of § 1341 to tangible as distinguished from intangible property rights" before

holding that "[c]onfidential business information has long been recognized as property").

Whether the object of the scheme is property within the meaning of § 1341 is determined by

whether it is property in the hands of the victim, not the alleged schemer.  *Cleveland*, 531 U.S. at

26-27 ("We conclude that § 1341 requires the object of the fraud to be 'property' in the victim's

hands . . . .").

　　　Under the facts of this case, the Court does not believe that any right to notice that

American workers may possess under the H1-B regulatory scheme is capable of giving rise to a

property interest within the meaning of § 1341.  The H1-B visa program was designed to allow

nonimmigrant professionals to enter the United States temporarily for employment in specialty

occupations.  *See* 20 C.F.R. § 655.700.[3]  In order to obtain an H1-B employee, an employer must

first file a Labor Condition Application with the Department of Labor.  20 C.F.R. §  655.730.  As

part of this application process, the employer must provide:

> notice of the filing of the labor condition application to the bargaining representative
> of the employer's employees in the occupational classification in which the H-1B
> nonimmigrants will be employed or are intended to be employed in the area of

---

consider whether this case falls within the ambit of the honest services doctrine because the
Government is not pursuing this theory.  Tr. at 41 ("As far as the [M]otion to [D]ismiss is
concerned, the Government has tried to be clear from the outset [that] this is not an honest
services case.").

　　　[3]  Although some of the regulations governing the H1-B visa program have changed
significantly since the alleged inception of this conspiracy in 2003, the underlying substance of
those regulations remain mostly intact.  Accordingly, the Court will not delve into the temporal
permutations of the various H1-B regulations because it is not material to its analysis.

> intended employment, or, if there is no such bargaining representative, [post] notice of filing in conspicuous locations in the employer's establishment(s) in the area of intended employment . . . .

20 C.F.R. § 655.734.  Even assuming that this provision gives rise to an individual notice right for American workers, the Court cannot see how this right could constitute a sufficient property interest within the meaning of the mail fraud statute because it is not excludable, transferable, or otherwise controllable.[4]  *See Carpenter*, 484 U.S. at 26 ("Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit . . . ."); *United States v. Henry*, 29 F.3d 122, 115 (3d Cir. 1994) (holding that "competing banks' interest in a fair bidding opportunity does not meet this test," in part, because the condition that the bidding process would be fair is "not a grant of a right of exclusion, which is an important aspect of traditional property"); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) ("And the right to control a thing, for example, money, is an integral part of the property right in the thing itself.  When we say that we

---

[4]  Additionally, the Government's theory of property is admittedly novel, which mitigates against a finding of a sufficient interest because the scope of the mail fraud statute is determined in part by historical concepts of property rights.  *Pasquantino v. United States,* 544 U.S. 349, 356 (2005) (holding that "Canada's right to uncollected excise taxes" constitutes property under the similarly construed wire fraud statute, in part, because "[t]he common law of fraud confirms this characterization of Canada's right to excise taxes.  The right to be paid money has long been thought to be a species of property.");  *Cleveland*, 531 U.S. at 23, 24 (rejecting the Government's theories of property rights partially because "they stray from traditional concepts of property"); *United States v. Henry*, 29 F.3d 112, 155 (3d Cir. 1994) ("Thus, to determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right." (citing *United States v. Evans*, 844 F.2d 36, 41 (2d Cir. 1988), for the proposition:  "That the right at issue . . . has not been treated as a property right in other contexts and that there are many basic differences between it and common-law property are relevant considerations in determining whether the right is property under the federal fraud statutes.")); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (stating that "the indictment must still allege that the injured party has been deprived of something that fairly deserves the label of property under traditional usage").

own something, one of the things that we mean is that we can determine what to do with it.  We can either keep it or transfer it to someone else.  And we can choose those persons to whom we will transfer it."); *United States v. Doherty*, 867 F.2d 47, 60 (1st Cir. 1989) ("Getting jobs by false pretenses falls within the prohibition of § 1341 because it 'deprived' the Commonwealth 'of control over how its money was spent.'" (citing *McNally*, 107 U.S. at 360)).  In other words, the right to H1-B notice lacks all the traditional indicia of property that other courts have found determinative when analyzing whether something is property within the meaning of the mail fraud statute.  Accordingly, and in light of the Supreme Court's command to construe any ambiguity in the definition of property narrowly, the Court holds that notification rights under the H1-B regulatory scheme are insufficient as a matter of law to constitute property under § 1341.[5] *Cleveland*, 531 U.S. at 25 ("Moreover, to the extent that the word property is ambiguous as placed in § 1341, we have instructed that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." (internal quotations and citations omitted)).

The Court likewise concludes that the purported right of displaced workers in the employment that they would have obtained if Defendants had not fraudulently secured immigration documents for foreign workers does not constitute property within the meaning of § 1341.  According to the Government, Defendants secured employment contracts for foreign workers by depriving United States workers of their aforementioned notice rights, thereby precluding American workers from applying for and securing those employment contracts.  Pl.'s

---

[5]  The Court's conclusion is only strengthened by the Government's failure to provide any legal authority for its position on H1-B notice rights.  Pl.'s Br. in Supp. of its Resistance to Defs.' Mot. to Dismiss at 10 (stating without support that "A U.S. workers intangible right to notice . . . constitute[s] property for purposes of 18 U.S.C. § 1341.").  Indeed, the Government did not even attempt to analogize H1-B notice rights to any recognized property right.

Br. in Supp. of its Resistance to Defs.' Mot. to Dismiss at 13-14.  Defendants also allegedly deprived American workers of employment opportunities not only indirectly by the aforementioned scheme, but also directly by improperly refusing to hire domestic applicants, some of whom responded to newspaper ads for employment, in favor of alien workers.  *Id*. at 12. The Government asserts that this conduct deprived American workers of their property rights because employment, including lost job opportunities, falls within the definition of property under *Granberry,* 908 F.2d 278, and *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008).  The Court disagrees.

In *Granberry*, the Government charged the defendant with mail fraud for obtaining employment from a school district as a school bus operator by fraudulently concealing a prior murder conviction on his job application.  908 F.2d at 279.  According to the Government in *Granberry*, the school district would not have hired Granberry if it had known about the prior conviction.  *Id*.  The defendant moved to dismiss the indictment for failure to state an offense under § 1341, and the district court granted the motion, finding no sufficient property interest.  *Id*. The Eighth Circuit reversed, holding, in part, that "[a]n employment contract is property."  *Id*. at 280.  The Eighth Circuit reasoned that Granberry had deprived the school of money and property because the school district was entitled to an employee who conformed to its employment requirements, even though the school district would have paid another, qualified driver the same amount of money.  *Id*.  ("What the School District wanted was a competent school-bus driver who was truthful and had not been convicted of a felony, and this is not what it got.  The School District has been deprived of money in the very elementary sense that its money has gone to a person who would not have received it if all of the facts had been known.").

-9-

Likewise, in *Sorich*, the defendants were convicted of mail fraud for participating in a hiring scheme that "doled out thousands of city civil service jobs [in Chicago] based on political patronage and nepotism." 523 F.3d at 705. Defendants appealed the district court's denial of a motion to dismiss, arguing, in part, that "since the city would have filled these jobs and paid these salaries anyway, it has not suffered a loss." *Id*. at 713. In other words, the defendants argued that they did not commit mail fraud because the City of Chicago suffered no monetary or property loss. The Seventh Circuit rejected this argument, holding that "jobs are property for purposes of mail fraud" and reasoning that "the city paid for, and was cheated out of, qualified civil servants." *Id*. at 723.

The Court finds that the Government's reliance on these cases is misplaced. Both *Granberry* and *Sorich* stand for the well-recognized proposition that employment contracts or jobs *may* be property under § 1341. Indeed, Defendants do not seriously contest this proposition. However, under *Cleveland*, the mere possibility that employment may be property in some instances does not necessary establish that it is property in every mail fraud case. In *Cleveland*, the Supreme Court narrowed the scope of the mail fraud statute by concluding that "§ 1341 requires the object of the fraud to be 'property' in the victim's hands." 531 U.S. at 26. It is not sufficient for the object of the fraud to be property in the schemer's hands.[6] *Id*. at 25 ("[W]e do not here question that video poker licensees may have property interests in their licenses."). In this case, the Government has identified the alleged victims as displaced American workers,

---

[6] In applying this principle, the Supreme Court reversed a defendant's mail fraud conviction, finding that although the gambling license at issue was likely property in the hands of the defendant, it was not property in the hands of the issuing State. *Cleveland*, 531 U.S. at 25-26.

unlike the employers who were the victims in *Sorich* and *Granberry*.[7]  Since the employer in this

case is not an alleged victim and is, in fact, a co-defendant, *Sorich* and *Granberry* are

distinguishable because those courts measured whether employment is property from a different

perspective, namely that of the victim governmental entity.  Here, the Court is deciding whether

employment contracts are property from the generalized perspective of displaced American

workers, some of whom would have allegedly received employment but for Defendants' scheme.

The Court does not believe that putative displaced workers have a sufficient property interest

because such individuals never possessed any right to the disputed employment.  In other words,

Defendants did not deprive these displaced workers of any interest in employment that is

meaningfully excludable, transferable, or controllable.[8]  At best, these displaced American

---

[7] Importantly, the Government did not identify as victims the third-party employers who provided employment contracts to Defendants.  Pl.'s Br. in Supp. of its Resistance to Defs.' Mot. to Dismiss at 12-14.  Likewise, the Government never alleged that any United States workers were deprived of rights, including a right to compete, provided for in a collective bargaining agreement or similar contractual arrangement.  *See United States v. Douglas*, 398 F.3d 407, 417-18 (6th Cir. 2005) ("The right to compete guaranteed by the collective bargaining agreement in this case is sufficient to constitute property for purposes of the mail fraud statute.").

[8] While not directly dispositive of this issue, the Court's conclusion draws strength from a recent unpublished decision by the Federal Circuit  holding that an individual, who claimed to have been improperly terminated or rejected in favor of "H1-B aliens," did not have "a property right in employment at any of the accused employers."  *Watson v. United States*, No. 2007-5051, 2007 WL 1655231, at *3 (Fed. Cir. June 6, 2007).  In coming to this conclusion, the court stated:

> Regarding Mr. Watson's takings claim, the trial court noted that the Fifth Amendment requires a plaintiff to possess a private property interest.  *See, e.g.*, *American Pelagic Fishing Co. v. United States,* 379 F.3d 1363 (Fed. Cir. 2004).  To present a compensable claim, a property interest must include attributes such as the ability to exclude others from the use or enjoyment of that property.  *Members of the Peanut Quota Holders Ass'n v. United States,* 421 F.3d 1323 (Fed. Cir. 2005).  The trial court found no evidence of such a private property interest.  Indeed, Mr. Watson's only argument on appeal is that the failure of [the] alien labor certification officer to adjudicate his claim constitutes a taking.  Mr. Watson, however, never had

workers had prospective employment, i.e., a job opportunity, which is an insufficient "property" interest under §1341 for the same reasons.  Accordingly, the Court holds that the Government's alternative displaced worker theory is not cognizable under the law.[9]  Therefore, the Court must dismiss Counts Two through Nine.[10]

2.    *Mail Fraud as alleged in Counts Ten through Twelve.*

Defendants next challenge the validity of Counts Ten through Twelve of the Indictment, asserting that the Indictment fails to allege proper venue and fails to adequately state a mail fraud offense.  More specifically, Defendants first argue that these Counts are fatally flawed because "they contain no allegation supporting venue in the Southern District of Iowa."  Br. in Supp. of Mot. to Dismiss at 15.  Alternatively, Defendants argue that these Counts fail to state an offense because they omit an essential element, namely the allegation that Defendants fraudulently under-

_____

a property right in employment at any of the accused employers.  *Stone v. Fed. Deposit Ins. Corp.,* 179 F.3d 1368, 1374 (Fed. Cir. 1999) (observing the federal constitution provides property rights protection for public, not private employment). Thus, the decision of the certification officer not to investigate the accused employers could not have deprived Mr. Watson of a property right.

*Id.*  In accordance with this reasoning, the Court cannot see how the Government can predicate a mail fraud theory upon a displaced worker's purported right to employment when that individual has no cognizable right in that employment.

[9]  The Government seemingly offered several other alterative theories of property, including a purported collective American right in controlling employment and deprivation of "other meaningful rights."  Tr. at 41; Pl.'s Br. in Supp. of its Resistance to Defs.' Mot. to Dismiss at 12.  The Court will not, however, address these theories for two reasons.  First, the Government agreed with Defendants at the outset of the hearing on these matters that it was proceeding under the theories discussed by the Court.  Second, it is not the Court's role to sift through the Government's filings in order to determine which theories it is currently pursuing.  If the Government wishes to advance any of these alternative theories, it must do so unequivocally, with supporting reasoning and appropriate legal citations and with enough forewarning that Defendants have an opportunity to respond.

[10]  The Court notes that its decision renders moot Defendants' gilding arguments.

represented the number of employees the company had in order to pay a reduced filing fee for the immigration documents.[11]  *Id.* at 17-18.  In response, the Government argues that the Indictment alleges venue because it contains the statement "in the Southern District of Iowa."  Pl.'s Br. in Supp. of its Resistance to Defs.' Mot. to Dismiss at 3.  The Government further argues it can substantiate this claim of venue at trial.  *Id.*  Moreover, the Government argues that the Indictment is sufficient because it implicitly alleges that Defendants erroneously understated the number of employees.  *Id.* at 4.

     a.  *The adequacy of the venue allegations.*

The Court believes that the Indictment sufficiently alleges proper venue.  "Both Rule 18 of the Federal Rules of Criminal Procedure and the Constitution require that a person be tried for an offense where that offense is committed."  *United States v. Cabrales*, 524 U.S. 1, 5 (1998). Proof of venue is, thus, an element of every federal offense that the Government must allege and prove, although it can be waived.[12]  *United States v. Netz*, 758 F.2d 1308, 1312 (8th Cir. 1985) ("Proof of venue is an essential element of the Government's case.  It may be established either by direct or circumstantial evidence." (internal quotations and citations omitted)).  "An

----

[11]  The Court notes that Defendants' argument in this regard is much more nuanced than their arguments concerning Counts Two through Nine.  In Counts Two through Nine, Defendants were asserting that the Government was proceeding under flawed theory of mail fraud, whereas here, Defendants are merely asserting that the Government failed to properly allege a cognizable mail fraud theory.  Accordingly, the Court's analysis turns on whether the Indictment provided sufficient notice and not whether the governmental filing fees that give rise to Counts Ten through Twelve can constitute property.

[12]  However, "[u]nlike the other elements of a crime which must be proved beyond a reasonable doubt, venue need only be proved by a preponderance of the evidence, in the light most favorable to the government."  *United States v. Delgado*, 914 F.2d 1062, 1064 (8th Cir. 1990) (citations omitted).

indictment alleges proper venue when it alleges facts which, if proven, would sustain venue." *United States v. Bohle*, 445 F.2d 54, 59 (7th Cir. 1971), *overruled on other grounds by United States v. Lawnson*, 653 F.2d 299 (7th Cir. 1981). If an indictment fails to allege sufficient facts, the Defendant must raise the issue or risk waiving it, and the Court has the authority to dismiss any count that suffers from a defect in venue. *Id.*; *see also United States v. Black Cloud*, 590 F.2d 270, 272 (8th Cir. 1979) ("Where lack of proper venue is apparent on the face of an indictment, venue objections are waived if not made prior to trial."). In mail fraud cases under § 1341, venue is proper in either the district in which the letter at issue was mailed or received. *United States v. McGregor*, 503 F.2d 1167, 1170 (8th Cir. 1974) ("The Supreme Court and other circuits have accordingly held that the government may elect to bring [a mail fraud] prosecution in the district where the letter was mailed or where it was delivered." (citations omitted)).

In this case, the Indictment, with respect to Counts Ten through Twelve, alleges that "in the Southern District of Iowa" the Defendants did "cause to be sent" fraudulent immigration documents, namely Form I-129s containing material misrepresentations, to processing centers in Nebraska, Vermont, and California. Clerk's No. 59 at 35, 42. As a preliminary matter, the Court finds that these allegations, if proven, can satisfy the venue element for mail fraud under the test affirmed in *McGregor* because the Indictment alleges that Defendants sent fraudulent documents from the Southern District of Iowa. The Court further finds that the Indictment provides sufficient notice to the Defendants because it states the theory under which the Government will seek to satisfy the venue element for each offense. Defendants' argument, that "[c]ounts ten through twelve nowhere allege that Defendants mailed anything to or from the Southern District

of Iowa," is without merit.[13]   Br. in Supp. of Mot. to Dismiss at 16.   Moreover, Defendants'

insistence that the "boilerplate phrase" "in the Southern District of Iowa" is insufficient to allege

venue is also unavailing because the Government is not obliged to allege every fact giving rise to

venue in the Indictment and because this Indictment alleges proper venue and asserts the theory

of venue such that Defendants have adequate notice.   *Hance*, 501 F.3d at 906 ("Typically an

indictment is not sufficient only if an essential element of the offense is omitted from it.")

(quoting *Cuervo*, 354 F.3d at 985).   Accordingly, the Court finds that the Indictment alleges

proper venue.

      b.   *The adequacy of the mail fraud allegations.*

      The Court also finds that Counts Ten through Twelve allege all the essential elements of

mail fraud and, thus, are cognizable offenses.   As stated earlier:

> An indictment is legally sufficient on its face if it contains all of the essential elements
> of the offense charged, fairly informs the defendant of the charges against which he
> must defend, and alleges sufficient information to allow a defendant to plead a
> conviction or acquittal as a bar to a subsequent prosecution.

*Carter*, 270 F.3d at 736 (citing *Wessels*, 12 F.3d at 750).   In this case, the manner and means

section for Counts Ten through Twelve states, in part, that Defendants:

> caused to be filed Forms I-129 on behalf of Vision Systems Group, Venturisoft Inc.
> and Axiom System Inc. claiming 25 or fewer full-time equivalent employees in order
> to pay a reduced filing fee of $750, as opposed to a filing fee of $1,500 for employers
> with more than 25 full-time equivalent employees.

Clerk's No. 59 at 32.   The Indictment later states in Counts Ten through Twelve that Defendants,

"representing themselves to be agents of Venturisoft Inc.," sent immigration documents to the

---

[13]   Defendants' reliance on *United States v. Ramirez*, 420 F.3d 134, 143-48 (2d Cir. 2005)
is likewise without merit because, unlike the facts of that case, the Government is prosecuting
Defendants in the district in which they allegedly mailed the fraudulent documents.

Government indicating "the current number of Venturisoft employees was" "15", "18," or "23," depending upon the Count. *Id.* at 45.  As the Government concedes, these provisions do not explicitly state that Defendants committed mail fraud by fraudulently under-representing the number of employees at a shell company, Venturisoft, in order to pay a reduced filing fee under 8 U.S.C. § 1184(c)(9).  However, the Court believes that these excerpts provide a strong implication of this both because they state Defendants were acting through another entity, and because there would be no reason to focus on the twenty five employee threshold except to allege fraudulent under-representation.

The Court recognizes, though, that the Indictment's remaining language somewhat obscures the force of this implication.  First, the lengthy Indictment contains explicit allegations of wrongdoing in other, similar provisions, which weakens the reasonableness of relying on any implication contained in the allegations.  For example, the Indictment also alleges that various immigration documents contained "false representations as to the work locations for the nonimmigrant worker" and that other documents "contained representations as to the prevailing wage for the location in Iowa, rather than the prevailing wage where the worker would actually be employed."  Clerk's No. 59 at 32, 34.  Second, the Indictment contains numerous statements that, at most, provide trivial background information regarding the alleged crimes, which again reduces the reasonableness of relying on any implication because of the difficulty associated with sifting out seemingly peripheral allegations.[14]  For example, the Indictment in the same manner and

---

[14]  The Court's concern is only heightened by the asymmetry between the two provisions at issue.  The manner and means excerpt refers to Defendant Vision Systems, Venturisoft, and Axiom filing documents claiming 25 or fewer employees, while Counts Ten through Twelve only reference Venturisoft filings.  Clerk's No. 59 at 32, 42.  This disjuncture increases the difficulty in determining what crime the Indictment is actually alleging.  In fact, the disjuncture

means section also alleges that Defendant Vision Systems used fraudulent immigration

documents to obtain green cards more quickly in an effort to attract foreign workers, even though,

by the Government's own account, no mail fraud theory is predicated upon this allegation.  *Id*. at

32; Tr. at 10.  Nevertheless, the Court cannot ignore the strong inference created by the cited

excerpts and, thus, finds Counts Ten through Twelve of the Indictment minimally adequate to

meet the low viability threshold because those Counts sufficiently allege, albeit indirectly, all the

elements of mail fraud and provide adequate notice regarding those charges.  *See United States v.

Sewell*, 513 F.3d 820, 821 (8th Cir. 2008) ("An indictment will ordinarily be held sufficient

unless it is so defective that it cannot be said, by any reasonable construction, to charge the

offense for which the defendant was convicted." (internal quotation and citations omitted)).

3.     *The forfeiture Count*.

Defendants next contest the forfeiture allegation contained in Count Eighteen.  Count

Eighteen states, in relevant part:  "Upon conviction of any of the offenses . . . set forth in Counts 1

through 12 of this Superseding Indictment, the *Defendant* shall forfeit to the United States . . . any

property, real or personal, which constitutes or is derived from proceeds traceable to the offense."

Clerk's No. 59 at 45 (emphasis added).  Defendants assert that this allegation is fatally defective

because it fails to specify which of the three Defendants are subject to forfeiture.  Defs.' Br. in

Supp. of Mot. to Dismiss at 18-19 ("The Defendants cannot discern which of them are 'the

Defendant' referenced in count eighteen.").  The Government resists this argument, claiming

───────────────

appears to have even misled the Government because, in its pleadings relating to Counts Ten
through Twelve, it argues that the "evidence . . . at trial will demonstrate that [the Government]
was defrauded of . . . at least $183,000 due to Axiom System Inc. filings."  Pl.'s Br. in Supp. of
its Resistance to Defs.' Mot. to Dismiss at 4-5.  Such evidence, however, is likely irrelevant
because Counts Ten through Twelve expressly rely *only* on the Venturisoft filings.

without citation to any legal authority:  "Because all three defendants are included in Counts One

through Twelve, the defendants are on notice that Count Eighteen applies to all three defendants.

Count Eighteen is not fatally vague."  Pl.'s Br. in Supp. of its Resistance to Defs.' Mot. to

Dismiss at 5.

The Court finds that Count Eighteen is fatally vague because it fails to specify which

Defendant is subject to forfeiture.  According to Federal Rule of Criminal Procedure 32.2(a):  "A

court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or

information contains notice to the defendant that the government will seek the forfeiture of

property as part of any sentence in accordance with the applicable statute."[15]  "The 'essential

purpose' of notice is to inform the defendant that the government seeks forfeiture so the

defendant can marshal evidence in his defense."  *United States v. Silvious*, 512 F.3d 364, 370 (7th

Cir. 2008) (citations omitted).  In this case, the Court does not believe the Government provided

any of the Defendants with adequate notice.  First, the notice of forfeiture failed to identify any

Defendant by name.  Second, the notice of forfeiture only states that the property of the

"Defendant" is subject to forfeiture, despite the fact that there are multiple Defendants.  While

this may seem like a technicality, the Court views identifying the subject of a forfeiture allegation

as elemental to the viability of the forfeiture because a defendant needs to know, with some

certainty, whether or not his property is subject to forfeiture so that he has the opportunity to

mount a defense.  The Government's argument that all Defendants possess adequate notice

---

[15]  During the initial pendency of the Indictment, a provision of Rule 7(c)(2) was still in effect and provided for substantially similar protections, as the language was virtually identical to Rule 32.2(a).  Although there is no substantive difference, the Court is conducting its analysis under Rule 32.2(a).

because they are expressly named in Counts One through Twelve, which are referenced in the forfeiture allegation, belies the express language of the forfeiture allegation, as it only identifies a *singular* Defendant.  While the Court may occasionally look past the express language of an indictment to its substance, the Court cannot simply override the express language of the Indictment in these circumstances.  The Court is also unaware of how any form of *de facto* notice can fix such an elemental problem.  Accordingly, the Court strikes the forfeiture allegation contained in Count Eighteen.[16]

### B.    *Motion to Suppress*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const., amend IV.  It also mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  *Id*.  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotations and citations omitted).

In their Motion to Suppress, Defendants assert that Agent Ponce's February 11, 2009 search was unreasonable because the Warrant authorized the Government to search and seize some items without probable cause.  Defs.' Br. in Supp. of Mot. to Suppress at 7.  In other words, Defendants claim that the Warrant is overly broad.  *Id*.  ("Because the Warrant's list of items to be seized includes records far removed from any probable cause established by the Ponce

---

[16]  The Court notes that its decision moots Defendants' alternative forfeiture argument.

Affidavit, the Warrant was overbroad.").  Defendants also argue that Agent Ponce's search was

unreasonable because the Warrant failed to specify, with particularity, what items could be

searched and seized, thereby allowing the Government to rummage through their property for

evidence of criminality.  *Id.* at 18-21; Defs.' Reply in Supp. of Mot. to Suppress. at 8 ("As set

forth in the Opening Brief, because the Search Warrant authorized the executing agents to seize

virtually every paper or electronic file relating to Vision Systems' business operations, it is a

constitutionally prohibited general warrant.").  Finally, Defendants assert that Agent Ponce's

search was unreasonable because he disregarded the limitations in the Warrant, which turned it

into an unreasonable, warrantless search and seizure.  Defs.' Br. in Supp. of Mot. to Suppress at

21-28.  More specifically, Defendants claim that the Government flagrantly disregarded the terms

of the Warrant by indiscriminately seizing documents and by failing to follow the protocols

relating to the handling of the seized digital information.[17]  *Id.*  The Government denies each of

Defendants' claims.

     1.    *The scope of the Warrant.*

     A search warrant must be supported by a showing of probable cause to be valid under the

Fourth Amendment.  *See Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).  The Government must

make this showing as to each place to be searched and each item to be seized.  *United States v.*

*Christine*, 687 F.2d 749, 753 (3d Cir. 1982) ("The Fourth Amendment dictates that a magistrate

---

    [17]  Defendants make two additional arguments in the footnotes of their briefs relating to
whether Exhibit A, which described the place to be searched, was properly attached to the
Warrant and whether the Government properly returned the executed Warrant to the issuing
Magistrate.  Defs.' Br in Supp. of Mot. to Suppress at 22 n.14; Defs.' Reply in Supp. of Mot. to
Suppress at 11 n.9.  Based upon the record made at the hearing and the underlying filings, the
Court is unsure if Defendants still wish to pursue these arguments.  Accordingly, the Court will
not address them unless Defendants file an appropriate motion directly addressing these issues.

may not issue a warrant authorizing a search and seizure which exceeds the ambit of the probable cause showing made to him.").[18]   "Probable cause exists to support the issuance of a search warrant if, based on a totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997) (quoting *Illinois v. Gates*, 462 U.S. at 238).   When reviewing a magistrate judge's determination of probable cause, the Court must give deference to the magistrate's determination because "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."  *Gates*, 462 U.S. at 238 (internal quotations and citations omitted).   If a warrant "authorizes the seizure of items as to which there is no probable cause," then the warrant is defective for being "overly broad."  *Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d 137, 149 (3d Cir. 2002) (citations omitted).   Finally, even if a warrant is defectively overbroad, any evidence the Government obtains under the warrant may, nevertheless, be admissible under the good faith doctrine.  *Id*. at 149 ("Evidence seized pursuant to an overly broad warrant need not be suppressed if the good faith exception applies.").

The Court believes that Agent Ponce's Affidavit ("Affidavit") provides adequate support

---

[18]   Over the objections of the Government, Defendants assert that the Court must apply Third Circuit law, instead of Eighth Circuit law, because the search warrant was issued by a district court in the Third Circuit.  Defs.' Br. in Supp. of Mot. to Suppress at 5 n.5 (citing *United States v. Restrepo*, 890 F. Supp. 180, 191 (E.D.N.Y. 1995), and *United States v. Gerena*, 667 F.Supp. 911, 926-27 (D. Conn. 1987)).  The Court assumes, without deciding, that Third Circuit law applies to Agent Ponce's search because the Court agrees, in principle, with the concept that the validity of a search warrant should be measured by the governing laws of the issuing jurisdiction.  To hold otherwise would risk the integrity of the federal courts because the validity of a search might then rest solely upon the district of prosecution.  *See Gerena*, 667 F. Supp. at 926-27.  The Court notes, however, that this dispute is purely academic given the similarity between the standards of both Circuits and the Court's analysis in this case.

for the Warrant.  His Affidavit states that "Defendant Viswa Mandalapu and Chandra Mandalapu are brothers and the president and the senior vice-president of [Defendant] Vision Systems, respectively."  Aff. ¶ 18.  The Affidavit further states that "Vision Systems' employee base consists primarily of aliens."  *Id.* ¶ 22.  The Affidavit also indicates that Vision Systems established what would appear to be a fully functioning office in Coon Rapids, Iowa.  *Id.*  ¶¶ 38 ("Vision Systems calls the Coon Rapids location their 'Regional Office and Development Center' on their website."); 41 ("The mail [received at the Coon Rapid's location] is then placed into an express mail package and forwarded to the Vision Systems office in New Jersey by the landlord's secretary.  As previously indicated, the records obtained from Coon Rapids Municipal Utilities also show that telephone calls are automatically forwarded to the New Jersey Office.").  The Affidavit additionally states:  "From 2003 to 2007, Vision Systems submitted approximately 56 Form 1-129s to [the Government] reporting that the alien beneficiary of each would work in Iowa."  *Id.* ¶ 55.  Moreover, the Affidavit states:  "From December 2004 to July 2008, Vision Systems caused to be sent . . . a quarterly Employer's Contribution and Payroll Report to the Iowa Workforce Development in Des Moines, Iowa claiming to employ an average of 8 workers in Iowa each quarter between January 2004 and June 2008."  *Id.* ¶ 61.

The Affidavit then indicates that the Coon Rapids office is a shell office and that no Vision System employees work in Iowa.  *Id.* ¶¶ 40 ("Surveillance by agents at the Coon Rapids location has shown no employees working at the location."); 41 ("Questioning of persons that work in the reception area for the Coon Rapids building owner reveal that no Vision Systems employee has ever actually worked in Coon Rapids.").  In addition, the Affidavit indicates that Defendant Vision Systems did not even have authority to conduct business in Iowa during part of

the time it claimed to have Iowa employees. *Id.* ¶ 36 ("On or about August 7, 2006, the Iowa

Secretary of State revoked Vision Systems' corporate Certificate of Authority. . . .  As a result of

this revocation, Vision Systems was not authorized to do business in the State of Iowa.").

Moreover, the Affidavit details three specific examples of when Defendant Vision Systems

claimed that an employee worked in Iowa, despite the fact that the employee possessed an out of

state driver's licence. *Id.* ¶¶ 63-77.  The Affidavit also indicates the extensive scope of this

suspected immigration scheme.  First, the Affidavit indicates that a large portion of Defendant

Vision Systems' revenue was likely derived from the scheme.  *Id.* ¶ 48 ("An initial analysis by

agents of Vision Systems' financial records has revealed that approximately 50% of Vision

Systems' monthly income is from payments received from third party companies, the majority of

which are either other IT companies or staffing companies that appear to be hiring Vision

Systems' employees in violation of the terms of the H1B [sic] visa.  The staffing companies

appear to be subcontracting Vision System's employees to the actual clients.").[19]  Second, the

Affidavit creates a strong inference that Defendants have been hiding their ill-gotten gains

through transfers to related corporations, including Venturisoft, or perhaps even overseas.  *Id.* ¶¶

14-18, 46, 47, 53.

Although the Court could distill additional incriminating statements from the Affidavit,

the Court firmly believes that the foregoing statements provide a substantial basis for the

---

[19]  Defendants challenge the propriety of relying on paragraph 48 of the Affidavit,
arguing that it contains "unsubstantiated allegations and statements of Special Agent Ponce's
'opinion' that Vision Systems and Viswa engaged in criminal wrongdoing." Defs.' Br. in Supp.
of Mot. to Suppress at 8.  The Court disagrees because Agent Ponce states the basis for his
conclusion, namely the "analysis."  While thin, the Court does not believe Agent Ponce was
required to elaborate further on this point for the magistrate to rely upon it.

magistrate's finding of probable cause.  The magistrate found that probable cause existed to

believe that Defendants were involved in:  immigration fraud, in violation of 18 U.S.C. § 1546;

money laundering, in violation of 18 U.S.C. § 1956; mail fraud, in violation of 18 U.S.C. § 1341;

wire fraud in violation of 18 U.S.C. § 1343; and conspiracy to commit immigration fraud and

money laundering, in violation of 18 U.S.C. § 371.  Hr'g Ex. 2 at 1.  The Affidavit supports the

magistrate's conclusions because the previous excerpts indicate that Defendants were

systematically filing fraudulent immigration documents, routinely employing foreign workers in

violation of their visas, funneling money into other entities or out of the country in an effort to

avoid detection, and conspiring to do so.[20]  Moreover, the probable cause arising from these

statements justifies the expansive list of documents to be searched and seized in the Warrant

because of the complexity of the scheme, the extent to which the scheme had infected Defendant

Vision Systems' operations, and the distribution of the criminal proceeds through the company

and Defendants Viswa and Chandra Mandalaupu's finances, as well as that of the related

companies.  *United States v. Am. Investors of Pittsburgh, Inc.*, 879 F.2d 1087, 1106 (3d Cir.

1989) ("The fact that the warrant authorized a search for a large amount of documents and records

does not necessarily render the search invalid so long as there exists a sufficient nexus between

the evidence to be seized and the alleged offenses.").  While the Court would have preferred a

more confined search, it cannot conclude that there was no substantial basis to believe that

probable cause existed to search and seize any of the items articulated in the Warrant.

---

[20]  The Court's conspiracy conclusion primarily stems from Defendants Chandra and
Viswa Mandalapus' positions within Defendant Vision Systems, as well as their connections to
the related companies, mostly Venturisoft, which engaged in large transactions with Defendant
Vision Systems.

Defendants' arguments to the contrary are unpersuasive mostly in light of the deferential review standard.  First, Defendants argue that the Affidavit is defective because it improperly relies on Agent Ponce's unsubstantiated opinion.  Defs.' Br. in Supp. of Mot. to Suppress at 8.  However, the Court's analysis does not rest upon Agent Ponce's opinions, even though some of his opinions appear sufficiently substantiated.  Second, Defendants argue that the Affidavit is defective once the irrelevant sections, namely those relating to background information or failing to allege an impropriety, are discarded.  *Id*.  However, the Court finds these provisions relevant because they provide the context for the Government's subsequent allegations of wrongdoing and help to establish the alleged conspiracy in this case.  Third, Defendants assert that the probable cause was insufficient to justify the search and seizure of such a large volume of business and personal documents, including financial records.[21]  *Id*. at 10-18.  However, while the scope of the Warrant was admittedly broad, the Court does not believe the scope was impermissibly broad because even the more questionable categories of documents identified by the Warrant are supported by probable cause, at least under the deferential review standard.  Moreover, even assuming no probable cause existed, the good faith exception would apply with full force to any potential defect in this aspect of the Warrant because the Warrant is not so lacking in probable cause that a reasonable officer would have known it was defective.  Accordingly, the Court holds that the Warrant was not defective for being overly broad.

2.      *The particularity of the Warrant.*

"The Fourth Amendment provides that warrants must 'particularly describ[e] the place to

---

[21]   The Court notes that Defendants identified 34 separate categories of documents within the Warrant.  Defs.' Br. in Supp. of Mot. to Suppress at 10.

be searched and the persons or things to be seized.'"  *United States v. Yusuf*, 461 F.3d 374, 393

(3d Cir. 2006) (quoting U.S. Const., amend. IV).  This particularity requirements "makes general

searches . . . impossible and prevents the seizure of one thing under a warrant describing another.

As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."

*Marron v. United States*, 275 U.S. 192, 196 (1927).  In other words, the Fourth Amendment

proscribes a general warrant, that is, a warrant that "essentially authorize[s] 'a general exploratory

rummaging in a person's belongings.'"[22]  *Yusuf*, 461 U.S. at 467 (quoting *Coolidge v. New

Hampshire,* 403 U.S. 443, 467 (1971)).  Whether a warrant is sufficiently particular is a case-

specific determination that will turn on the circumstances at hand.  *Am. Investors of Pittsburgh*,

879 F.2d at 1106 ("Here, given the range of information required to unravel the laundering

scheme and the extent of participation by the parties, the warrant was as specific as circumstances

would allow, however broad the requirements of the search might be.  We cannot see how any

more precise language in the affidavit could have limited the scope of the search authorized by

the magistrate, despite the fact that the language of the warrant was broader than that of the

affidavit."); *see also Yusuf*, 461 F.3d at 395.  Previously, courts have found the following

language in warrants to be impermissibly vague:

---

[22]  In drawing a distinction between an overbreath challenge and a particularity challenge,
the *Yusuf* court noted:

> There is a legal distinction between a general warrant, which is invalid because it
> vests the executing officers with unbridled discretion to conduct an exploratory
> rummaging through the defendant's papers in search of criminal evidence, and an
> overly broad warrant, which describes in both specific and inclusive general terms
> what is to be seized, but authorizes the seizure of items as to which there is no
> probable cause.

461 F.3d at 393 n.19 (internal quotations and citations omitted).

> (1) evidence of "smuggled goods," *Boyd v. United States*, 116 U.S. 616 [] (1886); (2) evidence of "obscene materials," *Marcus v. Search Warrant*, 367 U.S. 717 [] (1961); (3) evidence of "books, records, pamphlets, cards, lists, memoranda, pictures, recordings, and other written instruments concerning the Communist Party of Texas," *Stanford v. Texas*, 379 U.S. 476 [] (1965); (4) evidence of "illegally obtained films," *United States v. Cook*, 657 F.2d 730 (5th Cir. 1981); and (5) evidence of "stolen property," *United States v. Giresi*, 488 F. Supp. 445 (D.N.J. 1980), *aff'd*, 642 F.2d 444 (3d Cir. 1981).

*Yusuf*, 461 F.3d at 393.

In this case, the Court believes the Warrant is sufficiently particular given the complexity and extent of the suspected immigration scheme. The Warrant, as set forth in Attachment B, authorized the Government to review virtually all of Defendants' business and personal records, thereby making this an admittedly broad warrant without much specificity. However, as discussed *supra*, the Affidavit indicates that the suspected scheme was complex and that any evidence pertaining to it would be disbursed throughout the company's records, whether it be in the employee personnel records, the company's financial documents, or the Defendants' correspondence, both internally and externally with other private and public entities. Indeed, the Affidavit contained allegations that a significant portion of Vision Systems' revenue stemmed from this scheme and, accordingly, most company records would seemingly contain evidence of the scheme.[23]  Aff. ¶ 48 ("An initial analysis by agents of Vision Systems' financial records has

---

[23]  The Court's conclusion draws strength from the Eighth Circuit's decision in *United States v. Kail*, where the Circuit held that systemic fraud throughout a business will lower the particularity requirement for a search warrant. 804 F.2d 441, 445 (8th Cir. 1986) ("While the search warrant in this case was broad in the sense that it allowed inspectors to seize almost all of the business records of Coin & Stamp Gallery, we would conclude that under the particular facts of this case the scope of the warrant was justified. This is because it would not be possible through a more particular description to separate those business records that would be evidence of fraud from those that would not since there was probable cause to believe that fraud permeated the entire business operation.").

revealed that approximately 50% of Vision Systems' monthly income is from payments received

from third party companies, the majority of which are either other IT companies or staffing

companies that appear to be hiring Vision Systems' employees in violation of the terms of the

H1B [sic] visa.").  Moreover, the Affidavit indicated that the non-corporate Defendants, by virtue

of their positions in Defendant Vision Systems, involvement in related companies, and overseas

banking, would likely have evidence of at least the suspected money laundering scheme disbursed

throughout their personals records, including financial records and communication documents.

Consequently, the Court does not believe it was practicable for the magistrate to refine the

categories of documents the Government could search and seize beyond that which he did in the

Warrant.  Defendants' specific objection to Section A(c) of Attachment B is unpersuasive because

each of those types of documents could reasonably be expected to contain evidence of the

extensive scheme and because, taken as a whole, the Attachment limits the search to the

aforementioned crimes.  Defs.' Br. in Supp. of Mot. to Suppress at 19; Warrant, Attach. B.

Therefore, the Court holds that the Warrant was sufficiently particular.

3.     *The execution of the Warrant.*

"The general touchstone of reasonableness which governs Fourth Amendment analysis

[also] governs the method of execution of the warrant."  *United States v. Ramirez*, 523 U.S. 65, 71

(1998).  An officer executing a search warrant must be careful to scrupulously observe the

limitations set forth in a search warrant.  *Bivens v. Six Unkown Named Agents of Fed. Bureau of

Narcotics*, 403 U.S. 388, 395 n.7 (1971) ( "[T]he Fourth Amendment confines an officer

executing a search warrant strictly within the bounds set by the warrant.").  Indeed, "[i]t is

incumbent on the officer executing a search warrant to ensure the search is lawfully authorized

and lawfully conducted." *Groh v. Ramirez*, 540 U.S. 551, 563 (2004).  "Hence, the seizure of

items not described in the warrant violates the Fourth Amendment–and the items should be

suppressed–unless an exception to the warrant requirement applies." *United States v. Legg*, 18

F.3d 240, 242 (4th Cir. 1994) (citing *Horton v. California*, 496 U.S. 128, 133-34 (1990)).  "A

flagrant disregard for the limitations of a search warrant might make an otherwise valid search an

impermissible general search and thus require the suppression or return of all evidence seized

during the search." *Marvin v. United States*, 732 F.2d 669, 674-75 (8th Cir. 1984) (citations

omitted); *Am. Investors of Pittsburgh, Inc.*, 879 F.2d at 1107 ("What we focus upon is whether

the officers' conduct overreached to the extent that it rendered an otherwise valid warrant so

general in nature that it failed to authorize a legal search.").  "The Supreme Court, however, has

expressly dictated that the flagrant disregard standard applies only where the government exceeds

the scope of the authorized search in terms of the places searched, and not to cases in which the

government indulges in excessive seizures." *United States v. Decker*, 956 F.2d 773, 779 (8th Cir.

1992) (citing *Waller v. Georgia,* 467 U.S. 39, 43 n.3 (1984)).

     a.   *The document seizure.*

     With respect to indiscriminately seizing documents, the Court finds that any malfeasance

by the Government does not justify suppressing all of the fruits of the search.  On direct

examination, Agent Ponce testified that:  he had a copy of the search warrant; he generally

explained its contents to the other individuals participating in the search, all of whom seemed to

understand his briefing; he was aware of a site review[24] meant to ensure that only documents

falling under the search warrant were seized; and to his understanding, the search complied with

---

[24]  The record is unclear on exactly what the site review entailed.

all of the terms of the Warrant.[25]  Tr. at 111-12.  On cross examination, he additionally testified

that he answered questions for searching agents throughout the day.  Tr. at 133.  However, on

cross examination, he also testified that he did not know how many, if any, of the other agents

conducting the search read the Warrant before entering the office.  *Id*. at 116.  Agent Ponce

further testified that his briefing only included general descriptions of items to be sought, instead

of the more narrow, sometimes time specific, categories of documents contained in the Warrant.[26]

---

[25]  Agent Ponce specifically testified:

Q.  Did you have a copy of the search warrant present at that time?
A.  Yes.
Q.  And did you explain to the other agents the contents of the search warrant?
A.  Yes.
Q.  And did they understand what was being searched during the execution of that search warrant?
A.  Yeah.  I believe so.  Yes.  There weren't any questions.
Q.  And during the execution of the search warrant, was there, in fact, a review done of the premises in order to try to determine and seize only the items that were covered under the search warrant?
A.  Yes.
 . . .
Q.  To the best of your recollection, was the execution of the search warrant . . . on February 11, 2009, in compliance with the Court's order as set forth in the search warrant?
. . .
A.  Yes, it was.

Tr. at 111-12.

[26]  For example, Agent Ponce testified that he instructed Agents to look for immigration documents and financial records in general, even though the Warrant specifically authorized the taking of only certain immigration documents from "January 2002" and on, and certain financial records from the "2002 through 2008 tax years."  Tr. at 117 ("Q.  All right.  Now, you told them as a general proposition that they were looking for immigration documents, personnel documents, and financial records; correct?  A.  Yes.  Q.  Did you in any way narrow the scope of whose immigration documents they were to look for?  A.  No, I don't think so.  Q.  Did you in any way narrow the scope of whose personnel documents they were supposed to look for?  A.  No.  Q.  Did you in any way narrow the scope or explain what kind of financial records they

*Id*. at 116-17; Hr'g Ex. 2 at 3-4.  In addition, he testified that his discussions with other agents failed to include any information as to which were *not* subject to search and seizure.  *Id*. at 117 ("Q. Now, in that meeting where you were instructing the people, what things did you tell them not to take?  A.  I don't think we really talked about what not to take, but what to take.").  Agent Ponce, likewise, testified that he did not know if the individuals actually conducting the search either knew what items fell within the ambit of the Warrant or complied with the limitations in the Warrant.  *Id*. at 129-31.  Agent Ponce finally testified that the Government seized a large volume of documents, nearly 100 boxes, that required two postal trucks to transport.  *Id*. at 118.  Moreover, Special ICE Agent Christopher Doyle ("Agent Doyle") testified that he participated in the February 11, 2009 search by imaging hard drives and that he had to ask for a copy of the Warrant to read because there was no briefing by the case agents.  *Id*. at 73 ("Q.  Right.  Did anyone try to verbally tell you, or orally tell you what was in the search warrant?  A.  No, that's why I read the search warrant.").  Agent Doyle even stated that the case agent who handed him the Warrant to read was "irritated" by his request.  *Id*. at 72.

In light of this evidence, the Court does not believe that the Government flagrantly disregarded the limitations contained in the Warrant.  The evidence strongly indicates that Agent Ponce failed to adequately explain the nuances of the Warrant to his team and failed to monitor their compliance with its restrictions, which suggests that his search team might not have adhered to the Warrant.  *United States v. Heldt*, 668 F.2d 1238, 1261 (D.C. Cir. 1981) ("Warrants are not self-executing; they require agents to carry them out.  In order for a warrant's limitations to be

were supposed to be looking for?  A.  Bank statements, checkbooks–bank statements, primarily, and any other financial-related documents. . . .");  Hr'g Ex. 2 at 3-4.

effective, those conducting the search must have read or been adequately apprised of its terms."). The Court cannot, however, draw this conclusion here because the only other testifying member of the search team, Agent Doyle, stated that he compensated for the lack of instruction and oversight by personally reading the Warrant and attempting to follow its precepts.[27] Consequently, the Court is uncertain what, if any, actual impact Agent Ponce's lack of oversight produced, especially in light of the fact that he was answering searching agents questions all day.[28]  Moreover, the mere fact the Government seized a large volume of documents, approximately 100 boxes, provides virtually no insight as to whether the Government indiscriminately seized documents because the Warrant's scope was extensive, accounting for the sheer magnitude of the suspected scheme.  Indeed, the Court would expect the Government to seize a large volume of documents.  Finally, Defendants' only direct evidence of governmental impropriety stems from affidavits submitted by each of the non-corporate Defendants, who allegedly saw Agent Ponce and his team execute the search.  The affidavits state that the Government began indiscriminately seizing documents in the afternoon.  Clerk's No. 90. However, the Court cannot trust the veracity of their statements because neither of the non-corporate Defendants subjected themselves to cross examination.  Accordingly, and even in light of the following discussion on the Government's partial mishandling of the electronically stored

---

[27]  The Court notes that Agent Doyle focused on imaging hard drives, not seizing documents, but his experience is nonetheless relevant because it shows a level of compensation by a member of Agent Ponce's search team.

[28]  The Court also notes that there was another lead investigator, Agent Cress, on the scene of the search, but without more information on his role, the Court cannot draw any firm conclusions about the impact of his presence outside of the fact that he also answered questions from searching agents.  Tr. at 117, 133.

information, the Court finds that the Government did not flagrantly disregard the Warrant when searching and seizing documents.[29]

    b.  The electronic data seizure.

With respect to the electronically seized information, the Court believes that the Government's reckless disregard for the Warrant's specific procedures regarding the handling of digital information after the February 11, 2009 search requires suppression of this evidence.  The Warrant in this case expressly authorized the Government to make digital images of electronic storage devices, including hard drives, under limited circumstances.  Hr'g Ex. 2, Attach. B, B(b)(iii) ("If it is practical, and the digital device cannot be searched on site in a reasonable amount of time and without jeopardizing the ability to preserve data, the computer personnel will make a forensically sound image of the data contained on the digital device (a 'data image') during the execution of this search and shall seize the data image rather than the digital device itself.").  The Warrant, however, also expressly established a limiting protocol for the Government to follow when handling the digital images.  More specifically, the Warrant required the Government to make an initial search of any digital image within sixty days or obtain a court order extending the time, stating in relevant part:

> If the computer personnel . . . make a data image pursuant to subparagraph iii above, the computer personnel will initially search the digital device or data image within a

---

[29]  Moreover, even if the searching agents had engaged in "excessive seizures," the remedy would not be suppression of the entire search because the Government had the authority under the Warrant to search the places in which it allegedly seized an excessive number of documents.  *Waller*, 467 U.S. at 43 n.3 ("Petitioners do not assert that the officers exceeded the scope of the warrant in the places searched.  Rather, they say only that the police unlawfully seized and took away items unconnected to the prosecution. . . .  In these circumstances, there is certainly no requirement that lawfully seized evidence be suppressed as well." (citations omitted)).

reasonable amount of time not to exceed 60 days from the date of execution of the warrant. If, after conducting such an initial search, the case agents determine that the digital device or data image contains any data falling within the list of items to be seized pursuant to this warrant, the government will either (1) return the digital device, keeping a data image for further analysis, provided that, prior to such return, the owner and user(s) of the digital device stipulate individually and in writing to the authenticity and accuracy of the data image or (2) seek an order of the Court allowing the government to retain the original digital device for further analysis. If the digital device or data image does not contain any data falling within the list of the items to be seized pursuant to this warrant, the government will return the digital device or delete the data image. If the government needs additional time to determine whether the digital device or data image contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original sixty day period from the date of execution of the warrant.

Ex. 2, Attach. B, B(b)(vi).

Despite this express, unambiguous language, the record before the Court indicates that the Government failed to adhere to the protocol because it failed to properly search Defendants' electronic data within 60 days or request an time extension. During its February 11, 2009 search of Defendant Vision Systems' office, the Government made digital images of 21 hard drives. Tr. at 92. The Government then transferred those images to a computer expert stationed in Omaha, who proceeded to verify the integrity of the images, extract all files matching the search criteria Agent Ponce sent to him, and send the extracted files to Agent Ponce on May 4, 2009. *Id.* 92, 94; Hr'g Ex. 8. The expert, however, never personally determined whether any data on the images fell within the scope of the Warrant. Tr. at 98 ("Q. You never determined yourself whether data on the hard drives fell within the items to be seized as listed in the search warrant? A. No. I just–no."). He merely extracted files based upon Agent Ponce's search criteria, which is alone insufficient to determine if any data fell within the ambit of the Warrant because the search criteria were over-inclusive and not tailored to the limitations set forth in the Warrant. Hr'g Ex. A (stating that the search terms included "all email files," "Word (or Word type) documents

-34-

opened/modified in the last year," and "spreadsheets opened/modified in the last year"); Tr. at 97.

Consequently, the Government failed to conduct an adequate initial search of the data images

within the 60 day time frame mandated by the protocol because Agent Ponce did not even receive

the images until May of 2009.[30]   Tr. at 124.   Moreover, the Government never presented any

evidence that it sought an extension of time.   Indeed, Agent Ponce, the lead governmental

investigator, testified he was simply unaware of this explicit Warrant requirement.   *Id*. at 136 ("Q.

Did you understand that the review of everything on the computers had to be done within 60

days?  A.  No.  I can't recall having that deadline, a 60-day deadline.").

    The Court believes that the Government's utter disregard for the protocol explicitly set

forth in the Warrant requires suppression under the facts of this case.   In *United States v. Gerber*,

the Eleventh Circuit held that "completing a search shortly after the expiration of a search warrant

does not rise to the level of a constitutional violation and cannot be the basis for suppressing

evidence seized so long as probable cause continues to exist, and the government does not act in

bad faith," which seemingly includes reckless conduct.  994 F.2d 1556, 1560-61 (11th Cir. 1993)

(cautioning that its decision not be "misunderstood to be providing a precedent for careless

attention to the acquisition of warrants, including their duration").   In applying this principle, the

Eleventh Circuit upheld the Government's search underneath a vehicle's hood three days after the

authorizing federal search warrant expired because:  probable cause still existed to search the

vehicle; the Government was unaware that the warrant would expire, due in part to the warrant

---

[30]   The record indicates that a "taint team" did review the computer data at some point to
determine if it contained privileged communications.  Tr. at 126, 135.  The taint team did not,
however, review the data to determine if it fell within the scope of the Warrant.  *Id*. at 124-26,
135.  Accordingly, the Government cannot rely on the search by the taint team.

expiring within a day of its issuance rather than in a typical ten day period; and the delay was due to the Government's desire to avoid damaging the vehicle by waiting until the next business day when a mechanic would be able to assist them.[31]  *Id.*

Similarly, the Tenth Circuit, in *United States v. Sims*, upheld a search of an individual's office and computer one day after "the warrant had expired by its own terms" because "there was no showing that the one-day delay was the result of any intentional disregard of the terms of the warrant" and because "there is no evidence [that the delay] had any effect on the Government's probable cause to search."  428 F.3d 945, 955 (10th Cir. 2005).  In reaching this conclusion, the Tenth Circuit adopted a slightly different analytical approach by applying its jurisprudence on technical violations of Federal Rule of Criminal Procedure 41, which governs federal search warrants, to technical violations of a search warrant's own express terms.  *Id.* ("Although we are here dealing with a violation of the warrant itself, rather than a violation of Rule 41 per se, we find the same analysis applies to technical violations of the warrant.").  The Tenth Circuit standard stems from a widely accepted Ninth Circuit case, which held:

> "Unless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression of evidence only where (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule."

*United States v. Hugoboom*, 112 F.3d 1081, 1088 (10th Cir. 1997) (quoting *United States v. Stephenson*, 648 F.2d 1231, 1235 (9th Cir. 1981)).  While this underlying standard does not

---

[31]  The Eighth Circuit appeared to apply a more rudimentary form of the First Circuit test in *United States v. Gibson*.  123 F.3d 1121, 1124-25 (8th Cir. 1997) (upholding a search four-days after the issuance of a warrant that stated "make immediate search" because probable cause still existed and because the Government provided a reasonable explanation for the delay).

reference reckless conduct and while the Tenth Circuit did not consider recklessness in *Sims*,

most, if not all, circuits applying the *Stephenson* approach interpret the standard to require

suppression when the Government violates Rule 41 in bad faith, which includes reckless conduct.

*United States v. Freeman*, 897 F.2d 346, 349 (8th Cir. 1990) ("This general refusal to apply the

exclusionary rule to violations of Rule 41 provisions, absent a constitutional infirmity or showing

of prejudice or reckless disregard, has been adopted in other circuits." (collecting cases from the

Seventh, Ninth, Tenth, and Eleventh Circuits)); *see also United States v. Martinez-Zayas*, 857

F.2d 122, 136-37 (3rd Cir. 1988) (applying the substantively identical *Burke* test to require

suppression when reckless disregard or bad faith is shown) *overruled on other grounds by United

States v. Chapple*, 985 F.2d 729 (3d Cir. 1993); *United States v. Comstock*, 805 F.2d 1194, 1207

(5th Cir. 1986) ("Consequently, we hold that, where there is no constitutional violation nor

prejudice in the sense that the search would likely not have occurred or been as abrasive or

intrusive had Rule 41 been followed, suppression in these circumstances is not appropriate if the

officers concerned acted in the affirmative good faith belief that the warrant was valid and

authorized their conduct.  Good faith in this context implies not only that Rule 41 was not

knowingly and intentionally violated, but also that the officers did not act in reckless disregard or

conscious indifference to whether it applied and was complied with.").  Indeed, the Eighth Circuit

recently re-affirmed this approach in *United States v. Mutschelknaus*.  592 F.3d 826, 829-30 (8th

Cir. 2010) ("[N]oncompliance with Rule 41 does not automatically require exclusion of evidence

in a federal prosecution.  Instead, exclusion is required only if a defendant is prejudiced or if

reckless disregard of proper procedure is evident." (internal quotation and citations omitted)).

Accordingly, the Court believes that whether it applies the Eleventh Circuit's or the Tenth

Circuit's approach to violations of a search warrant's express terms, suppression is required when the Government acts in bad faith, that is, where it either intentionally or recklessly disregards the express terms of the search warrant.

The Court believes that the Government's execution of the electronic portion of the Warrant was in bad faith because the          the failure to adhere to the temporal restrictions in the protocol stems from Agent Ponce's gross recklessness.  Just as in *Gerber*, the Government commenced searching Defendants' electronic documents during a time period articulated by the Warrant, namely on February 11, 2009, when the searching agents created the data images.  The Government likewise did not finish searching the images until a time period after that authorized by the Warrant, namely May 2009 or thereafter.[32]  Unlike *Gerber*, though, the source of delay in this case was not a reasonable reaction to an unanticipated hindrance.  The source of the delay was due to Agent Ponce's ignorance about the Warrant's temporal restrictions on searching electronic data that was contained in the protocol.  Tr. at 136 ("Q.  Did you understand that the review of everything on the computers had to be done within 60 days?  A.  No.  I can't recall having that deadline, a 60-day deadline.").  The Court finds such a failure in knowledge inexcusable under the facts of this case and, at best, the product of a highly reckless course of action because Agent Ponce indicated he read the Warrant, explained its contents to his search team, and participated in the search of the electronic data.  Tr. at 116, 124, 136.  Indeed, Agent Ponce was the lead Government investigator, and as such, he should have been keenly aware of Warrant's requirements, especially since the 60 day time frame is ten times the standard ten-day

---

[32]  The record is unclear on when Agent Ponce finished his search of Defendants' data.

window that the Government had at that time to execute a warrant under Rule 41.[33] The

Government attempts to negate Agent Ponce's failure by stating he relied in good faith upon the

protocol, which was only meant to apply to seized computer hardware. *Id*. at 174.  The Court,

however, finds the Government's argument unpersuasive because no reasonable interpretation of

the unambiguous protocol could support Agent Ponce's actions.  The Court likewise finds the

Government's argument that it was unreasonable to expect Agent Ponce to search the data images

within 60-days unpersuasive because the Government failed to even seek an extension of the time

as the protocol expressly provides.  *Id*.  Accordingly, the Court believes that Agent Ponce acted

recklessly in deciding when to search Defendants' electronic data and believes that this

recklessness towards the express terms of the Warrant produced a temporal violation of the

Warrant.[34]  Consequently, the Court finds that the Government cannot rely upon the Warrant to

---

[33]  Federal Rule of Criminal Procedure 41 has since been amended to provide for a 14 day window.

[34]  Agent Ponce's recklessness in deciding when to conduct his electronic search is consistent with his other conduct during the course of executing the Warrant.  Besides his seemingly reckless conduct while overseeing the search of Defendants' offices, the record additionally indicates that Agent Ponce acted recklessly while conducting the actual search of Defendants' electronic files because he did not restrict his search terms to those that necessarily fell within the ambit of the Warrant.  Instead, Agent Ponce searched for files pertaining to his overall investigation, thereby risking suppression of all evidence derived from his searches, including non-electronic evidence.  In Agent Ponce's own words:

> Q.  Well, if Agent Hernandez[,the Omaha forensic expert,] testified that he sent the images to you in May, would you have any basis to disagree with that?
> A.  No.  Sounds about right.
> Q.  So would these search terms have been run against the documents that you got, or the images you got from Hernandez in May and thereafter?
> A.  Yes.
> Q.  And would that have been the first time that anybody within the Federal Government actually started looking at those documents in the sense of reading the words in them to see what the documents were and what they said?

justify Agent Ponce's search.  Seeing no exception to the general warrant requirement, the Court

views Agent Ponce's searches of Defendants' electronic data as warrantless and impermissible.[35]

Therefore, the Court grants in part Defendants' Motion to Suppress.  The Government may not

---

> A.  As far as I know, yes.
> Q.  How did your group develop this list of terms?
> A.  How exactly?  It's based on the investigation, what we were looking for, to make it simpler, to find what we needed.
> Q.  So, for example, the first term, "bench," where does that come from?
> A.  From interviews with workers and prior investigations.
> Q.  And is there something in your warrant that establishes probable cause to believe that a document containing the word "bench" would contain evidence of a crime?
> A.  In the warrant?  I'd have to go back over the warrant.  I'm not sure.  I don't think it would.
> Q.  How about the word "account," is there something in your warrant that would establish probable cause to believe that the documents containing the word "account" would contain evidence of a crime?
> A.  Could you repeat?
> Q.  Is there something in your–I'm just trying to understand how you developed this list.
> A.  Uh-huh.
> Q.  Is there–was the list developed based upon the things contained in your warrant application?
> A.  Yes.
> Q.  Or was it based on a broader understanding of the case that you had?
> A.  A combination of both.  I mean–
> Q.  So it was not just based upon the warrant application, it was based upon other investigative work that you had done?
> A.  Right.

Tr. at 125-26.  Additionally, Agent Ponce's conduct in executing the electronic portion of the Warrant indicates that there might be a more subtle flaw in the Warrant, namely that some of the probable cause underlying the Warrant had become stale, which theoretically could also erode the justification for the Warrant's lack of particularity.

[35]  The Court in *United States v. Brunette* reached an identical conclusion for substantially similar reasons in a case also involving the Government's failure to timely search seized electronic data.  76 F. Supp. 2d 30, 42 (D. Me. 1999) ("The Government has offered no legitimate reason for its delay.  Therefore, because the Government failed to adhere to the requirements of the search warrant and subsequent order, any evidence gathered from the Leading Edge computer is suppressed.").

use any evidence derived from the data images.[36]

## III.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART both Defendants' Motion to Dismiss (Clerk's No. 81) and Defendants' Motion to Suppress (Clerk's No. 87).  Specifically, the Court hereby dismiss Counts Two through Nine, as well as the forfeiture allegation contained in Count Eighteen.[37]  The Court also suppresses all fruits derived from the Government's search of Defendants' data images.

IT IS SO ORDERED.

Dated this _24th_ day of March, 2010.

_____
ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT

---

[36]  The Court's decision renders moot Defendants remaining arguments about the impropriety of the electronic seizures.

[37]  If the parties still wish for the Court to strike individual allegations contained in the Indictment, then the parties should file an appropriate motion that precisely identifies each allegation and articulates the reason that the allegation(s) should be stricken.